UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID ALAN SPEERS, M.D., DECEASED
BY: MICHAEL SPEERS AND BETHANI
SPEERS-VANDERAH, CO-PERSONAL
REPRESENTATIVES OF THE ESTATE OF
DAVID ALAN SPEERS, M.D., DECEASED,

               Plaintiff,                       Case No. 4:04-cv-0032

v.                                         HON. DAVID W. McKEAGUE[1]

COUNTY OF BERRIEN, SHERIFF PAUL HON.
BAILEY, DEPUTY SERGEANT ERIC L. HYUN,
WHO WAS ON INFORMATION AND BELIEF
DAY SHIFT COMMANDER OF AUGUST 22, 2002,
DEPUTY LT. EDWARD KNAPP, DEPUTY KEVIN
M. TIERNEY, DEPUTY PERRY A. BUNDY, DEPUTY
BARRY D. OLIVER, DEPUTY BUDDY CHAPMAN,
DEPUTY DONALD MANGOLD, SPECIAL DEPUTY
MARK HAUEISEN, R.N., SPECIAL DEPUTY PAT
BROWN, AND SPECIAL DEPUTY & BERRIEN
COUNTY MEDICAL EXAMINER, ROBERT CLARK,
jointly and severally,

               Defendants.
_____/

## OPINION

     This case involves the death of David Allen Speers, M.D. ("Speers"), which occurred while

Speers was incarcerated at the Berrien County Jail ("Jail") between August 20, 2002 and August 23,

2002.  Plaintiff filed a three count complaint against Berrien County/Sheriff Bailey and many of the

---

[1]  The Honorable David W. McKeague, United States Circuit Judge for the Sixth Circuit
Court of Appeals, sitting by designation.

individual deputies and nurses who had contact with Speers while Speers was incarcerated at the Jail. In Count I, plaintiff alleges that defendants were deliberately indifferent to plaintiff's serious medical needs in violation of the Eighth amendment. In Count II, plaintiff alleges that defendants were grossly negligent in violation of Michigan state law. In Count III, plaintiff alleges that defendants (except Nurses Haueisen and Brown) violated Speers' Fourth, Fifth Sixth, Eighth and Fourteenth Amendment rights by illegally holding Speers after Judge Wiley ordered Speers to be released from Jail. This case is before the Court on the individual defendants' Motion for Summary Judgment (except Dr. Gray) (Docket # 86), and Sheriff Bailey/Berrien County's Motion for Summary Judgment (Docket # 125). The individual defendants claim that they are entitled to qualified immunity. The Court conducted a hearing on the individual defendants motion for summary judgment on February 28, 2005 and took the matter under advisement. The parties filed supplemental briefs where plaintiff set forth the specific allegations plaintiff alleges against each defendant and the factual support plaintiff has for each claim. Defendants responded by filing a supplemental brief denying plaintiff's allegations. Defendant County/Sheriff Bailey then filed a separate motion for summary judgment. The Court did not hold a hearing on defendant County's Motion for Summary Judgment. For the reasons that follow, the Court will grant defendant County's motion in part, deny defendant County's motion in part and deny the individual defendants' motion for summary judgment on all counts.

## I. FACTS

On July 17, 2002, Speers, was stopped by the New Buffalo Police Department and was arrested for OUIL 1st. Speers was transported to the Jail. Speers' screening form noted that he had

a history of delerium tremors ("DT's") or seizures after drinking.  (Ex. 5, Pl.'s Br. in Opp'n to Def.'s Mot for Summ. J as to Indiv. Def's ("Pl's 1st Response Br.")) Speers pled guilty to impaired driving and was released on a $100.00 bond on the condition that he not possess or consume alcohol.  On August 20, 2002, Speers appeared for a pre-sentencing meeting before his probation officer, Terry Bambrich.  Speers was intoxicated at the meeting.  A preliminary breathalyzer test ("PBT") indicated that Speers' blood alcohol level was .227.   Bambrich determined that Speers' intoxication constituted a violation of the bond conditions imposed by Judge Wiley on July 17, 2002.

Bambrick brought Speers before Judge Wiley who revoked Speers' bond on the pending impaired driving plea, and charged Speers with contempt of court.  Speers waived his right to have his attorney present and pled guilty to the contempt charge.  (August 20, 2002 Hearing Transcript, pp. 4:10-5:24, Ex. A, Def. County's Mot. for Summ. J.)  Judge Wiley sentenced Speers to three days incarceration on the contempt charge.   Speers' half-sister, Sue Ellen Farris-Whitmore ("Ms. Whitmore"), was present during the hearing when Speers was found to have violated the conditions of his bond.

After the August 20 hearing, Speers was booked into the Jail,  received and signed a medical screening form.  Speers was not seen by medical staff at this time, nor was he given any medication. Speers did not eat the meal that was provided to him.  The following morning, August 21, 2002, Dr. Lynn Gray, the Jail doctor on call, visited Speers at the Jail's medical clinic.  LPN Ellen Marshall and RN Mark Haueisen were present at this meeting.  Based on Dr. Gray's examination and the history provided by Speers, Dr. Gray prescribed a number of medications, including Librium, Altace, Cardizem, Affexor, Thiamine, and Lipitor after noting that Speers was going through "alcohol withdrawal" and was experiencing upper body tremors.  (Gray Dep., p. 17:2-21, Ex. E, Def.

3

County's Mot. for Summ. J.)  Dr. Gray administered the medications during the examination, and Nurse Haueisen administered them again later that afternoon.  (Marshall Dep., p. 44:4-22, Ex. F, Def. County's Mot. for Summ. J).  Due to Speers' withdrawal from alcohol, Speers was classified for "sick call" and placed in cell OR-03, one of the Jail's medical observation cells. (Inmate Event Maintenance Sheet for Speers, Ex. D, Def. County's Mot. for Summ. J).

Speers made several phone calls to his residence in the afternoon of August 21, 2002. (Telephone Record, Ex. G. Def. County's Mot. for Summ. J.) Subsequently, Speers appeared before Judge Wiley to be sentenced on the impaired driving charge, for which Speers was arrested on July 17, 2002.  However, due to an apparent medical emergency by Speers' attorney, Judge Wiley postponed Speers' sentencing on the impaired driving plea.  Instead, Judge Wiley reinstated Speers' bond with additional terms and conditions.  (August 21, 2002 Hearing Transcript, p. 3:8-4:1, Ex. H, Def. County's Mot. for Summ. J.)  Judge Wiley specifically stated that Speers would be released the following morning, August 22.  Judge Wiley added the condition that Speers participate in the REACT-tether program, which requires compliance with a telephone monitoring system.  (*Id.*)

Speers returned to the Jail after the hearing and was placed in OR-03 for the remainder of the afternoon of August 21, 2002.  Speers' medicines were distributed to him in the afternoon and evening, including the Librium, which was prescribed by Dr. Gray to help alleviate the effects of Speers' withdrawal symptoms. (Marshall Dep, pp. 45:22-46:8, Ex. F, Def. County's Mot. for Summ. J.)  Kenneth Warner, an inmate and "day trustee" at the jail testified that he observed Speers in the late evening on August 21, 2002, and that Speers "seemed okay," did not appear to be in "any danger," and did not display any behavior inconsistent with the general jail population.  (Warner Dep., pp. 18:11-23 & 20:8-22, Ex. I, Def. County's Mot. for Summ. J.)  Warner further testified that

4

Speers appeared nervous and agitated on August 21. *Id.*

Speers' condition declined by the morning of August 22, 2002, although he was coherent enough to make a phone call to his residence. (*See* Bybee Aff., Ex. 20, Pl's 1st Response Br.; Ex. G, Def. County's Mot. for Summ. J.)  Deputy Donald Mangold came on duty at approximately 7:00 a.m. on August 22, 2002.  Speers' wife, Judith, recalled speaking with Speers that morning, and testified that during the call she did not recall Speers ever expressing any complaints regarding his care and treatment in the jail. (Judith Speers Dep., p. 66:9-11, Ex. J, Def. County's Mot for Summ. J.)  Nurse Haueisen dispensed Speers' medication at approximately 8:00 a.m. on August 22, 2002, and stated in an affidavit that Speers did not appear to require further medical attention.  (Second Supp. Aff. Of Haueisen, Ex. K, Def. County's Mot for Summ. J.)

Mrs. Speers and Ms. Whitmore arrived at the Jail on August 22 to pick up Speers, but were not allowed to take Speers home.  Ms. Whitmore was told that Speers would not be released because of his medical condition.  (Whitmore Aff., Ex. 10, Pl's 1st Response Br.)  At approximately 8:30 a.m., Buddy Chapman, one of the deputies in charge of the REACT-tether program went to Speers' cell.  Deputy Chapman arrived at OR-03, and observed Speers sleeping.  (Chapman Dep., pp. 18:11-17 & 20:1-21:22, Ex. L, Indiv. Def.'s Mot. for Summ. J.)  Based on Chapman's observation of Speers, Chapman's knowledge that Speers was experiencing alcohol withdrawals (or DT's), and his past experience with inmates going through withdrawals, Chapman concluded that he should wait to evaluate Speers for the REACT-tether program until a later time.  (*Id.*)  At approximately 9:30 a.m., Chapman sent a wiz-mail (e-mail) to the medical and Jail staff stating: "Speers was to go on React/Tether today, however he is going thru D.T.'s at this time.  We will wait & see how he is the next few days..." (Wiz Mail, Ex. 23, Pl.'s 1st Response Br.)  According to Chapman, Speers was to

5

be released after his REACT-tether evaluation and once his home was properly equipped for the tether.  Chapman attempted to contact the Speers family to set up the REACT-tether program.  A "privacy manager" was installed on the phone line.  Chapman left a message on the family's answering machine that Speers was going through the DT's and the family should call Chapman to set up the tether program.  According to Chapman, the tether program could not be set up until such privacy manager was removed.

At approximately 10:30 a.m. on August 22, 2202, Mangold was advised that there was a problem in OR-03.  Speers was demonstrating unusual behavior and the other inmates in the cell wanted Speers moved, because Speers was "going nuts."  (Dep. Mangold, Ex. N, p. 28, 29, Indiv. Def.'s Mot. for Summ. J.)  Deputy Mangold determined it would be appropriate to move Speers to an individual observation cell known as OR-05.  (*Id*.)  Mangold reported Speers' move to the nurse on duty, Nurse Haueisen, and informed Haueisen that Speers was going through the DT's.  Nurse Haueisen acknowledged at his deposition that he knew Speers was being moved to OR-05 on August 22, but that Mangold never told him that Speers was going through the DT's.  Nurse Haueisen performed a visual assessment of Speers at approximately 11:00 that morning. (Haueisen Dep., p. 45, Ex. O, Indiv. Def. County's Mot. for Summ. J.)  Haueisen performed a second visual check approximately thirty minutes later, and stated that Speers was sitting quietly, eating his meal, and did not demonstrate any signs of distress.  (*Id*. at p. 45:19.)

At approximately 11:30 a.m. on August 22, 2002, Deputy Chris Aungst was contacted by Deputy Jim Hall who asked when Speers was going on tether. (Aungst Aff., ¶ 2, Ex. Q, Def. County's Mot. for Summ. J.)  Deputy Aungst told Deputy Hall that Deputy Chapman had already been down to see Speers, and that given his condition, the interview for the REACT-tether program

6

would be delayed.

Sometime before 12:15 p.m., Deputy John McCoy spoke to Mrs. Speers and Ms. Whitmore. McCoy explained that Speers' release was on hold pending compliance with the tether hook-up, and that the Jail staff was closely monitoring Speers' condition. McCoy told the Speers family that in order to comply with the REACT-tether requirements, it was necessary to have the privacy manager removed from the home phone. (McCoy Aff., ¶¶ 4-5, Ex. R, Def. County's Mot. for Summ. J.)

The written records indicate that the custodial staff continued to check on Speers every thirty minutes.[2]  At approximately 1:30 p.m., Haueisen again dispensed medications to Speers. (Haueisen Dep. p. 46:16, Ex. O, Indiv. Def.'s Mot. for Summ. J.)  Haueisen testified that Speers took his medications, did not appear to be in any distress, and that Speers simply returned to where he was sitting and put his head down. (Haueisen Dep., p. 48:4, Ex. O, Indiv. Def.'s Mot. for Summ. J.) Haueisen noted that Speers was experiencing hallucinations, such as picking at objects on the walls of his cell.  Haueisen did not perform an evaluation of Speers because there was no protocol for such evlauation. (*Id*.)

At approximately 3:00 p.m., the first shift officers went home for the day and the second shift came on watch at the Jail.  Defendant Pat Brown, another Jail nurse, dispensed 50 mg of Libridium at approximately 8:00 p.m. on August 22, 2002. (Brown Dep., p. 25:11-17, Ex. T, Def. County's Mot. for Summ. J.) According to Nurse Brown, Speers was "alert" at this time. (*Id*. at 30:8 - 33:12.)

---

[2]Plaintiff disputes this point.  Joshua Bybee testified that it was routine for the guards to check on inmates, and Speers in particular, every couple of hours and mark the medical check cards all at once.  Defendant's counter plaintiff's evidence by providing testimony from Sheriff Bailey.  When asked whether Bailey thought there was a possibility that his deputies did not check on Speers as indicated on the medical check sheet, Sheriff Bailey stated that "if they put their initials up there, they checked them."  (Bailey Dep., p. 112, Pl.'s Ex. 28.)

This contention, however, is also disputed.  Plaintiff argues that the evidence shows Speers was not given his medication (Bybee Dep., Docket # 199; Williams Dep., Docket # 198.)

The third shift custodial staff came on watch at approximately 11:00 p.m.  Eric Hyun was the shift commander, but stated that he did not have any contact with Speers until Speers was found unresponsive in his cell in the early morning hours of August 23, 2002. (Hyun Dep., p. 45:18, Ex. U, Def. County's Mot. for Summ. J.)  The other officers on duty during the third shift included Deputies Tierney, Bundy and Oliver.  Tierney was advised at the beginning of his shift that Speers was withdrawing from alcohol.  (Tierney Dep. p. 10:12, Ex. W, Def. County's Mot. for Summ. J.) Tierney observed Speers standing in his cell during a "walk through" at the beginning of his shift. and testified that he never thought Speers was "in danger." (*Id*. at 13:5.)

Deputy Bundy observed Speers on the night of Speers' death on several occasions.  Bundy was walking through the area near Speers' cell around midnight and heard Speers pounding on his cell door.  Approximately ten to fifteen minutes later, Bundy observed Speers again standing at the door.  According to Bundy, Speers did not appear to be in distress.  (Bundy Aff., Ex. X, Def. County's Mot. for Summ. J.)

Deputy Oliver also observed Speers on six occasions during his checks on Speers during the night of Speer' death.  During Oliver's checks of Speers he observed Speers reaching out the food slot and/or messing with the lock on his cell door.  (Second Supp. Oliver Aff., Ex. Y, Def. County's Mot. for Summ. J.)  At approximately 1:30 a.m., Oliver observed Speers sitting on the floor playing with Speers jail garments in his lap.  Oliver asked Speers how Speers was doing and stated that Speers looked at him and smiled.  (*Id*.)

Joshua Bybee testified at his deposition that he observed unusual behavior from Speers on

August 22 and 23.  Bybee testified that he saw Speers acting as though Speers was driving a truck and heard Speers asking for a wrench.  (Bybee Dep., Docket # 199, p. 77.)  Bybee testified that he observed Speers on the floor twitching and also observed Speers hitting Speers' head on the plexiglass cell window of his cell on Thursday, August 22.  (*Id*. at 78.)   Warner stated in his affidavit that he observed Speers with a hideous look on his face, yelling for help, wearing nothing but underwear.  (Warner Aff., Ex. 25, Pl.'s 1st Response Br.)  Warner also stated that he informed the deputies on duty of Speers' condition on several occasions, that Speers needed help in the early morning hours of August 23 and that he was informed by the deputies that they would "get to it." (*Id*.)  Other inmates at the jail, including Jack Swartz, and Mark Williams, also indicated that Speers was exhibiting increasingly strange behavior from August 21 until August 23, including tremors, yelling and not eating.  (Williams Aff., Swartz Aff., Appx. to Pl.'s Supp. Pleading.)

Tierney stated that he checked on Speers between 2:00 a.m. and 4:00 a.m. and that Speers was either sleeping or playing with the food slot or door lock at these times.  (Tierney Aff., Ex. V, Def. County's Mot. for Summ. J.)  At approximately 4:30 a.m., while checking on Speers, Oliver found Speers non-responsive.  Oliver called Sgt. Hyun for assistance.  Bundy proceeded to Speers' cell after receiving the call for assistance.  The officers performed CPR on Speers until ambulatory care arrived and Speers was pronounced dead.  Thereafter, Detective David Chandler and Sheriff Bailey arrived at the scene and contacted the medical examiner, Robert Clark.  Bailey directed the Michigan State Police to handle the investigation.

Plaintiff produced opinions from several medical doctors who opined that Speers was going through alcohol withdrawals and possible DT's during the time he was incarcerated at the Jail.  (*See* Spitz, Tennessen, Goldman, Kirkham, Bitterman, Pl.'s Supp. Pleading., Pl.'s 1st Response Br.)  Each

doctor reviewed the records in this case and Speers' autopsy records.  According to the doctors, Speers exhibited behavior throughout his incarceration that was bizarre and consistent win an individual going through acute alcohol withdrawals or the DT's.  Furthermore, Dr. Scott Jacobs stated that DT's is a "well known medical emergency," and DT's can be fatal if not treated properly. (Jacobs, Pl.'s Supp. Pleading.)  Jacobs also stated that alcohol withdrawal progresses as time passes and that the symptoms become more noticeable.  (*Id.*)

The County has formal policies involving treatment for detainees and prisoners in life-threatening emergencies, as well as management and care for detainees and prisoners experiencing alcohol and drug-related withdrawals.  (*See* Policy and Procedural Manual, Section J-52, Ex. 24, Pl's 2nd Response Br.)  J-52 states in relevant part:

> Policy I
>
> This facility will provide health care for inmates under the influence of alcohol or other drugs, experiencing withdrawal, or under risk of progression to higher levels of intoxication or withdrawal.
>
> > Procedure III
> >
> > Non-life threatening withdrawal can be done at this facility at the direction of the responsible physician.
> >
> > Procedure IV
> >
> > Acute withdrawal from alcohol . . . constitutes an immediate need for medical attention.  Symptoms of withdrawal are:
> >
> > > 1.  Alcohol – tremors, sweating, hallucinations, agitation, sleeplessness.
> >
> > Anyone demonstrating and/or suspected of withdrawal shall be referred to the medical staff immediately.  If medical staff is unavailable then referral shall be made to the hospital. Medical staff will treat withdrawal as ordered by the physician.

_____

(Ex. 24, Pl's 2nd Response Br.)  In the fifteen years prior to Speers' death, only three deaths occurred

at the Jail.  None of these deaths involved alcohol withdrawals.  Two deaths involved suicides, while

the third death was caused by an undiagnosed perforated ulcer.  (Def's Br. in Support of Mot. for

Summ. J. at 13.)  Plaintiff argues that Jail procedures were not followed after these deaths, in that

the Jail did not conduct a review of the deaths pursuant to section J-10 of the Policy and Procedural

Manual.

The County does not have a formal training program as it relates to alcohol

withdrawals/DT's.  Similarly, there is no written protocol or formal training program detailing how

to perform medical checks on prisoners/detainees.  (Bailey Dep. pp. 40-45, Ex. 23; Bailey Dep. pp.

57-61, Ex. 26, Pl.'s 2nd Response Br.)  Sheriff Bailey testified that officers receive "on the job

training" related to alcohol withdrawals/DT's and the proper procedure to follow when performing

medical checks.  (*Id.*)  According to Bailey, the Jail staff receives on the job training from "senior"

officers and by talking to the nurses.  (*Id.*)   Bailey did not state specifically what the "on the job

training" entailed, who received this training, or when such training occurred.

Before Sheriff Bailey took office, the Jail had been accredited by the National Commission

on Correctional Health Care ("NCCHC") of Chicago, Illinois.  The NCCHC found deficiencies in the

Jail and placed the Jail on probation, and required corrections for further accreditation. (Ex. 17, Pl.'s

2nd Response Br.)  The NCCHC outlined several policies where the Jail was deficient including a

request to submit proof that the correctional officers were trained in health-related topics.  There was

no specific reference in the NCCHC's report to the County's policy related to alcohol

withdrawals/DT's, or the County's policy regarding medical checks.  (*Id.*; Ex. 19, Pl.'s 2nd Response

Br.)  On January 30, 2001, Bailey wrote a letter to the NCCHC, withdrawing from the accreditation

program.  (Ex. 22, Pl.'s 2nd Response Br.)  Two separate Department of Correction Inspection

Reports cited the County for failure to comply with the requirements of the County's detoxification

cells, including removing obstructions from the view of OR-03 and OR-05 from the duty station and

failure to have a camera in the cells.  (Exs. 27, 28, Pl's 2nd Response Br.)  According to Sheriff

Bailey, the County was in the process of remodeling and updating the Jail in 2002, with planning for

the remodeling starting as early as 1999.  (Bailey Dep., pp. 70-76, Ex. 29, Pl's 2nd Response Br.)

## II. ANALYSIS

### A. Standard of Review

Summary judgment is proper if the non-moving party has failed to raise a genuine issue of

material fact as to any element of the claim, and the moving party is thereby entitled to judgment as

a matter of law.  Fed. R. Civ. P. 56(c).  The facts must be construed most favorably to the non-

moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586  106 S. Ct.

1348, 89 L. Ed. 2d 538 (1986).  The central issue is "whether the evidence presents a sufficient

disagreement to require submission to a jury or whether it is so one-sided that one party must prevail

as a matter of law."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52, 106 S. Ct. 2505, 91 L.

Ed. 2d 202 (1986).  The non-moving party must come forward with more than a "mere scintilla" of

evidence to create a genuine issue of material fact.  *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505.

The party opposing summary judgment cannot rest on its pleadings or merely reassert its previous

allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the

material facts."  *Matsushita*, 475 U.S. at 586, 106 S. Ct. 1348.

In the context of a 42 U.S.C. § 1983 action, the non-moving party must demonstrate a

genuine issue of material fact as to: (1) the deprivation of a right secured by the Constitution or the

laws of the United States; and (2) that the deprivation was caused by someone acting under color of state law. *Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). Section 1983 provides civil redress to inmates whose Eighth and Fourteenth Amendment rights are violated by persons acting under color of state law. *See Miller v. Calhoun County, et al.*, 408 F.3d 803 (6th Cir. 2005) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989). "Deliberate indifference" by prison officials to an inmate's serious medical needs constitutes a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

The Supreme Court established a mixed objective and subjective standard for ascertaining the existence of deliberate indifference in the context of the Eight Amendment. *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994). The objective component of the test requires the existence of a "sufficiently serious" medical need. *Blackmore v. Kalamazoo*, 390 F.3d 890, 895 (6th Cir. 2004) (noting that  summary judgment was inappropriate where jailers deemed [plaintiff's] condition sufficiently serious to place him in an observation cell, plaintiff complained orally and in writing for over two days before receiving medical treatment, a jury could reasonably find that Blackmore had a serious need for medical care that was "so obvious that even a layperson would easily recognize the necessity for a doctor's attention). The subjective component requires that the prison official possessed a "sufficiently culpable state of mind in denying medical care." *Miller*, 408 F.3d 803 (quoting *Farmer*, 511 U.S. at 834, 114 S. Ct. 1970). Mere negligence will not satisfy the subjective component, but a plaintiff need not show the actor acted with the knowledge that harm would result from their actions. *Farmer*, 511 U.S. at 835, 114 S. Ct. 1970.

The prison official must evince "deliberateness tantamount to intent to punish." *Horn v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir. 1994). "Knowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs is essential to a finding of deliberate indifference." *Id.* "An officials' failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* (quoting *Farmer*, 511 U.S. at 838, 114 S. Ct. 1970). "Whether a [defendant] had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842,114 S. Ct. 1970.

## B. Berrien County and Sheriff Bailey

The action against Sheriff Bailey, in his official capacity, is the same and equivalent to the action against the County of Berrien, on whose behalf the Sheriff acted. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 n. 55, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978).[3] A body politic constitutes a "person" within the meaning of § 1983. *Monell*, 436 U.S. at 690, 98 S. Ct. 2018. A municipality

---

[3] Plaintiff brought this action against Sheriff Bailey in his *individual* and his official capacity. Plaintiff, however, submitted a supplemental pleading on March 14, 2005, indicating that plaintiff was only suing Sheriff Bailey in his "official capacity." Furthermore, plaintiff represented to the Court, at a motion hearing on February 28, 2005, that plaintiff was no longer suing Sheriff Bailey in his individual capacity. However, plaintiff's most recent submission to the Court, Plaintiff's Response to Defendants' Motion for Summary Judgment (Dockety # 156), purports to sue Sheriff Bailey in his individual capacity. Plaintiff cannot satisfy the subjective component of a claim for deliberate indifference. *See Farmer*, 511 U.S. at 832, 114 S. Ct. 1970. To the extent that plaintiff may even "revive" this claim, the Court will grant defendants' motion for summary judgment as to plaintiff's suit against Sheriff Bailey in his individual capacity on Counts I, II and III, as there no evidence that Sheriff Bailey had any personal contact with Speers or had any knowledge whatsoever of the existence or extent of Speers' condition until after his death.

does not incur liability under a theory of *respondeat superior*.  *Id.* at 691, 98 S. Ct. 2018.  A municipality may be liable under § 1983 only if its policies or customs caused the constitutional violation at issue.  *Id.* at 694, 98 S. Ct. 2018.  "Municipal liability may attach for policies promulgated by the official vested with final policy making authority for the municipality."  *Miller*, 408 F.3d at 813 (citing *Pembaur v. City of Cincinnati,* 475 U.S. 469, 482-83, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986)).  State law determines whether an individual is a "policymaker" for purposes of § 1983.  *Id.*[4]

### 1. Count I – Deliberate Indifference

Plaintiff's response to the County's motion for summary judgment discloses that plaintiff's § 1983 claims in Count I are based on the allegation that Speers' death was caused by the Sheriff's failure to enforce existing written policy, which allowed the Sheriff's deputies and medical staff to follow a countervailing *de facto* policy, and by the Sheriff's failure to train deputy staff and medical staff in the area of alcohol withdrawls/DT's and failing to provide training as it pertain to how to properly carry out a medical check.

To impose § 1983 liability on a municipality, plaintiff must show that an officially executed policy, or toleration of a custom or *de facto* policy resulted in a constitutional deprivation.  *Doe v. Claiborne County, Tenn. By and Through Claiborne County Bd. of Educ.*, 103 F.3d 495, 507 (6th Cir. 1996).  Deliberate indifference in this context requires proof that a governmental entity disregarded a known or obvious consequence of its action.  *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997); *Board of County Commissioners of Byran County v. Brown*, 520 U.S. 397, 410,

---

[4] There is no dispute that under state law, Bailey, as sheriff, was the final "policymaker" over the Berrien County Jail.

117 S. Ct. 1382, 137 L. Ed. 2d 626 (1997).  "[A] plaintiff ordinarily cannot show that a municipality acted with deliberate indifference without showing that the municipality was aware of prior unconstitutional actions of its employees and failed to respond."  *Stemler*, 126 F.3d at 865. Municipal liability must rest upon a direct causal connection between the policies or customs of the city and the constitutional injury to the plaintiff.  *City of Canton, Ohio v. Harris*, 489 US. 378, 389, 109 S. Ct. 1197, 103 L .Ed. 2d 412 (1989).[5]  "[M]unicipal 'custom' may be established by proof of the knowledge of policymaking officials and their acquiescence in the established practice."  *Miller* at 814 (quoting *Memphis, Tenn. Area Local, Am. Postal Workers Union v. City of Memphis*, 361 F.3d 898, 902 (6th Cir. 2004)).  Customs must be "so permanent and well settled as to constitute a custom or usage with the force of law" in order to give rise to *Monell* liability.  *Id*. (citing *Doe*, 103 F.3d at 507 ).

While Speers' death is no doubt unfortunate, if not tragic, it does not follow, axiomatically, that the County is liable for his death under § 1983 for deliberate indifference.  To prevail on its municipal liability claim, plaintiff must establish: (1) the existence of a clear and persistent pattern of mistreatment of inmates experiencing alcohol withdrawal/DT's; (2) notice or constructive notice on the part of the County; (3) the County's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to take action regarding alcohol withdrawal/DT's can be said to amount to an official policy of inaction; and (4) that the County's custom was the "motivating force" or direct causal link in the constitutional deprivation.  *Miller*, 408 F.3d at 815 (citing *Doe*, 103

---

[5] Plaintiff does not argue that the County is liable for violations of the written jail policies.  Rather, plaintiff argues that the policies were deficient, in many regards, and that such deficiency amounted to a *de facto* policy of deliberate indifference, which ultimately led to Speers' death.

F.3d at 508).  Plaintiff generally must prove that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures.  *Id.*      Plaintiff alleges that the County defendants *de facto* policy or custom was to not provide inmates going through withdrawl or the DT's with adequate medical care or medical checks and to not refer inmates to the hospital. (*See* Pls' Amended Complaint, Count I; Pls' Supp. Brief, § IX.)  There were only three deaths at the Jail in the past fifteen years, none of which involved alcohol withdrawals or DT's.  (Aff. of Sheriff Bailey, Ex. EE, Def. County's Mot. for Summ. J.)  There is no evidence of similar incidents having previously occured at the Jail, such that the County was on notice of potential constitutional violations.

Plaintiff cites *Blackmore,* 390 F.3d 890, 900, for the proposition that the plaintiff created an issue of fact where the record showed a lack of *any* county policies, practices and adequate training for dealing with prisoner illnesses (emphasis added).  Unlike *Blackmore,* in this case, there clearly were written and formal policies for dealing with alcohol withdrawals.  The County had a written policy for dealing with alcohol withdrawals, although these policies were, at least, arguably not followed in this case.  (Policy and Procedure Manual, J-52, Ex. 24, Pl.'s 2nd Response Br.)  The policy requires that anyone suspected of withdrawal shall be referred to the medical staff immediately.  (*Id.*)

Plaintiff's reliance on correspondence and citation from the National Commission on Correctional Heath Care ("NCCHC") is unavailing.  Plaintiff argues that the County was put on notice by the NCCHC, and by the County itself during a review of the Jail, that the Jail did not meet current standards.  (*See* Exs. 17, 18, Pl.'s 1st Response Br.; *see also* Exs. 27, 28, Pl.'s 1st Response Br.)  In *Gray,* 399 F.3d at 617-18, the court noted that  two reports noting that "clearly suicidal"

inmates might go unnoticed, was not enough to establish a genuine issue of material fact, even where the case arose because of a detainee's suicide.  In this case, the reports plaintiff cites do not even mention withdrawal or DT's.  Any reliance on such reports does not raise a genuine issue of material fact as to County liability.  *Id.*

There is no reasonable basis from which a reasonable jury could base a decision that the County had a *de facto* policy, which allowed or required the custodial and medical staff to ignore medical emergencies of detainees or inmates, or otherwise allowed detainees or inmates to die without medical care.  *See Doe*, 103 F.3d at 508.  The record supports, and indeed, compels a contrary finding.  Based on the undisputed history of alcohol related deaths (or the lack thereof), there is no evidence in the record from which a reasonable jury could conclude that the County engaged in a clear and persistent pattern of mistreatment of inmates experiencing alcohol withdrawal/DT's or that the County was on notice of constitutional violations occurring and ignored those concerns.  *See Doe*, 103 F.3d at 508.  Accordingly, the Court will grant defendant County's motion for summary judgment as it relates to any alleged *de facto* policies related to withholding treatment for those inmates who experience alcohol withdrawals or DT's.[6]

---

[6] Plaintiff also seems to argue, albeit in a rather incoherent fashion, that the County had *de facto* policies of withholding blankets and mats to inmates and of not monitoring inmates with medical needs, by virtue of the fact that there was no security camera installed in OR-03 or OR-05 and that there was not an unobstructed view of the observation cells from the "duty desk."  To the extent that plaintiff relies on a *de facto* policy of the County related to withholding  a blanket or mat, and the alleged policy that Speers' cell was not completely unobstructed and did not have surveillance cameras, (*see* Pls' Supp. Pleading, Section IX.B), defendant County is entitled to summary judgment.  Plaintiff has not produced any evidence sufficient to satisfy any one of the four factors required by *Doe* in order to establish a municipal custom for purposes of § 1983. *Doe*, 103 F.3d at 508.  Plaintiff has failed to raise an issue of fact as to whether these *de facto* policies, even assuming *arguendo*, that they were *de facto* policies, were the "moving force" behind Speers' death.  *See Miller*, 408 F.3d 803; *see also Monell*, 436 U.S. at 690, 98 S. Ct. 2018; *see also  Harris*, 489 US. 378, 109 S. Ct. 1197.

Plaintiff contends, in a related argument, that the County is liable under § 1983 for its failure to properly train its correctional officers and medical staff regarding alcohol withdrawals and DT's. "Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a 'policy or custom' that is actionable under § 1983." *Harris*, 489 U.S. at 389, 109 S. Ct. 1197. Allegations that officers were improperly trained or that an injury could have been prevented with better training do not suffice to establish liability. *Sova v. City of Mt. Pleasant*, 142 F.3d 898, 904 (6th Cir. 1998).

In *Cherrington v. Skeeter*, 344 F.3d 631, 646 (6th Cir. 2003) (citing *Russo v. City of Cincinnati*, 953 F.2d 1036, 1046 (6th Cir. 1992)) the court noted that "to be actionable, a municipality's training must be inadequate to the tasks that its officers must perform, this inadequacy must be the product of deliberate indifference, and this inadequacy must have been closely related to or have actually caused the plaintiff's injury." There are at least two situations where the Sixth Circuit has recognized inadequate training as the result of deliberate indifference. *Skeeter*, 344 F.3d at 646. One such example is where a municipality fails to provide training and there are foreseeable consequences that could result from the lack of instruction. *Id.* (citing *Brown v. Shaner*, 172 F.3d 927, 931 (6th Cir. 1999)). The second example occurs when the municipality does not act in response to repeated complaints of constitutional violations by its officers. *Id.*

In *Gray v. City of Detroit,* 399 F.3d 612, 617 - 618 (6th Cir. 2005) (citing *Harris*, 489 U.S. at 390, 109 S. Ct. 1197), the court stated:

---

> [t]he Supreme Court has adopted an objective, "obviousness" approach to this question: It may seem contrary to common sense to assert that a municipality will actually have a policy of not taking reasonable steps to train its employees. But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

Generally, a plaintiff must show that the municipality ignored prior constitutional violations. *Fisher v. Harden,* 398 F.3d 837, 849 (6th Cir. 2005) (requiring plaintiff, in a deliberate indifference, failure to train case to show prior instances of unconstitutional conduct demonstrating that the County has ignored a history of abuse and was clearly on notice that the training in this particular area was deficient and likely to cause injury). However, a lack of training on fundamental concepts may allow a plaintiff to survive summary judgment where a violation of constitutional rights is "a highly predictable consequence of a failure to equip law enforcement officers with specific tools to handle recurring situations." *St. John v. Hickey,* --- F.3d ----, 2005 WL 1431400 (6th Cir. 2005) (quoting *Brown*, 520 U.S. at 407-408, 117 S. Ct. 1382); *see Solis v. City of Columbus,* 319 F. Supp. 2d 797, 812 (S.D. Ohio 2004) (question of fact existed in a failure to train case where city failed to formally train its officers, aside from an ad hoc practice that "emphasized the Fourth Amendment, to protect Fourth Amendment rights related to executing no-knock search warrants). Furthermore, in *Shamaeizadeh v. Cunigan,* 338 F.3d 535, 557 (6th Cir. 2003) the court noted that a plaintiff must allege facts linking the alleged failure to train to acts of the individual officers.

None of the individual officers involved in this case were formally trained to recognize alcohol withdrawals or the DT's. (*See* Oliver Dep., p. 7, Ex. 9, Pl.'s 2nd Response Br.; Bailey Dep.,

pp. 41-44, Ex 23, Pls' 2nd Response Br.)  Sheriff Bailey testified at his deposition that his deputies received "on the job training," meaning that they were educated about alcohol withdrawals by senior officers and nurses on staff.  (Bailey Dep., pp. 42-45, Ex 23, Pls' 2nd Response Br.)  While Sheriff Bailey testified that all his officers received on the job training, there is no evidence in the record before the Court describing what that training entailed, or which deputies received such training. Thus, this case is similar to *Solis*, 319 F. Supp. 2d 797, as the evidence related to the deputies' on the job training, when viewed in a light most favorable to plaintiff, amounts to little more than an *ad hoc* system of letting the deputies create their own system of training and determining what procedures should be followed in alcohol withdrawal cases.

In this case, there is no evidence that the County did not respond to repeated complaints of constitutional violations by its officers.  *Skeeter*, 344 F.3d 631, 646.  However, there are questions regarding whether the County's alleged failure to adequately train its officers was the product of deliberate indifference because the consequences of the lack of training were foreseeable. *Id.*  When viewing the evidence in a light most favorable to plaintiff, the record is replete with evidence of the officers' and nursing staff's recognition of Speers' withdrawal symptoms/DT's.  What is not entirely clear on the record before this Court, is whether the officers knew what to do in order to properly respond to Speers' condition.[7]   The record does not reveal that any actions were taken by the individual officers that were designed to deal with Speers' withdrawal symptoms, aside from monitoring Speers' condition and checking on Speers every thirty minutes.  The record does reflect

---

[7] For purposes of this motion, the Court will assume, without deciding, that Speers was suffering from the DT's, and not simply alcohol withdrawal.  While this evidence is disputed, and plaintiff may not be able to prove Speers was in fact suffering from the DT's, the Court, when viewing the evidence in a light most favorable to plaintiff, finds that there is sufficient evidence from which a jury could conclude Speers was suffering from the DT's.

the fact that alcohol withdrawals occur regularly at the Jail.  Plaintiff has alleged and produced evidence, that if believed, could establish that the County's failure to train its officers in matters related to alcohol withdrawals was linked to Speers' death.  *See Hickey,* 2005 WL 1431400; *see also Solis,* 319 F. Supp. 2d at 812.  Because the County failed to formally train its officers, and because there is no evidence in the record related to what type of on the job training its officers received and who received this training, the Court finds that there genuine issues of material fact, such that a jury could find that defendant's failure to train its officers resulted in a situation where there were foreseeable consequences, which could amount to constitutional violations, that could result from such lack of training.  *Skeeter*, 344 F.3d at 931.

Plaintiff has not established that the County had a formal or *de facto* policy that could establish that the County was deliberately indifferent to plaintiff's serious medical needs in this case.  Plaintiff has done a good job of pointing the finger at the County and accusing the County of allowing Speers to die a horrible death while the County just stood by and watched.  However, as noted above, plaintiff has failed to satisfy the *Doe* factors as it relates to plaintiff's *de facto* municipal custom argument.  Nonetheless, there is a significant enough dispute as to plaintiff's failure to train theory of liability that summary judgment is inappropriate on that part of plaintiff's claim.  Accordingly the Court will grant defendant County's motion for summary judgment as to plaintiff's argument that the County had a *de facto* policy of deliberately ignoring plaintiff's serious medical needs, but will deny defendant's motion on plaintiff's failure to train theory of § 1983 liability.

### 2. Count II – Gross Negligence

In Count II of plaintiff's amended complaint, plaintiff asserts a claim against the County for

gross negligence.  Berrien County has governmental immunity on plaintiff's gross negligence claim.

Section 691.1407 of the Michigan Compiled Laws provides the following:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function. Except as otherwise provided in this act, this act does not modify or restrict the immunity of the state from tort liability as it existed before July 1, 1965, which immunity is affirmed.

Mich. Comp. L. § 691.1407.  The operation of a county jail is a governmental function.  *See Jackson v. County of Saginaw,* 458 Mich. 141, 148, 580 N.W.2d 870, 874 (Mich. 1998); *Hill v. City of Saginaw,* 155 Mich. App. 161, 169, 399 N.W.2d 398, 402 (Mich. App. 1986).  "The gross negligence exception to immunity applies only to governmental officers, employees, members, and volunteers--not to governmental agencies themselves."  *Frame v. Royal Oak Tp. Fire Dept.*,  2003 WL 21921178 (Mich. App. 2003) (citing  *Smith v. Dep't of Public Health*, 428 Mich. 540, 605 n 19; 410 N.W. 2d 749 (1987)).  Berrien County is entitled to governmental immunity.  Mich. Comp. L. § 691.1407.  The Court will therefore grant defendant's motion for summary judgment on Count II of plaintiff's amended complaint.

### 3. Count III – Illegal Detention

Plaintiff alleges that Speers was illegally detained at the of his death, in violation of plaintiff's Fourth, Fifth and Sixth Amendment rights.  Plaintiff relies on *Alkire v. Irving,* 330 F.3d 802, 814-815 (6th Cir. 2003) for the proposition that Berrien County may be liable for holding Speers in violation of his Fourth Amendment rights.  *Alkire*, however, involved a "probable cause" determination, where defendant was held too long on a warrantless arrest for drunk driving.  There is no issue of probable cause in this case, and plaintiff has not attempted to show how this case is similar to *Alkire*, 330 F.3d 802.

The legal analysis noted above in Sec. II(B)(1), related to municipal liability, applies to plaintiff's claims in Count III.  Therefore for plaintiff to demonstrate municipal liability on Count III, plaintiff must (1) identify the municipal policy or custom; (2) connect the policy to the municipality; and (3) show that his particular injury was incurred due to execution of that policy. *Garner*, 8 F.3d at 364.

Plaintiff attempts to establish County liability by pointing out that "[t]here is no written policy within Berrien County Sheriff's Policy and Procedure Manual relating to tether bond procedure."  However, plaintiff has not even attempted to satisfy the requirements for establishing municipal liability under *Monell*, 436 U.S. at 694.  Plaintiff has not produced any evidence that could establish a County policy or custom of illegally detaining inmates.  Plaintiff has not set forth specific facts that establish that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e).  Accordingly, the Court will grant defendant County's motion for summary judgment on Count III of plaintiff's amended complaint.

### C. The Individual Defendants

### 1. Count I – Deliberate Indifference

The deliberate indifference analysis noted above in Sec. II(B), *supra*, applies to the claims against the individual officers as well.  Thus, to hold that a prison official is deliberately indifferent, the court must find that "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at

837, 114 S. Ct. 1970.[8]  A genuine issue of material fact can be raised based on a strong showing of

the objective component in the deliberate indifference analysis. *Estate of Carter v. City of Detroit,*

408 F.3d 305, 313 (6th Cir. 2005).  In *Carter*, the court noted that a genuine issue of material fact

existed where the decedent informed officers that she was experiencing chest pains, had not taken

her medication and needed to go to hospital.

There are several ways prison officials might show they were not deliberately indifferent

to a plaintiff's medical needs.  Prison officials charged with deliberate indifference might show, for

example, that they did not know of the underlying facts indicating a sufficiently substantial danger

and that they were therefore unaware of a danger, or that they knew the underlying facts but believed

(albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.  In

addition, prison officials who actually knew of a substantial risk to inmate health or safety may be

found free from liability if they responded reasonably to the risk, even if the harm ultimately was not

averted.  *Id.* at 844, 114 S. Ct. 1970.

### a. Deputy Buddy Chapman

Plaintiff acknowledges that Chapman saw Speers sleeping on the floor of his cell on

Thursday morning, that Chapman did not talk to Speers at that time and this is the only contact

Chapman had with Speers.  It is not disputed that Chapman sent an e-mail to jail staff advising that

Speers was going through DT's and that they would wait to see how Speers was doing in the "next

---

[8] The plaintiff must show that the deprivation alleged is objectively sufficiently serious. *Id.* at 834.  The seriousness of Speers' medical condition is disputed in this case.  The Court finds plaintiff has produced sufficient evidence such that a reasonable juror could conclude that Speers was suffering from a serious medical need.

few days" before releasing him.  There is no evidence that Chapman undertook any further efforts to obtain medical assistance for Speers.

Viewing the evidence in a light most favorable to plaintiff, Chapman knew Speers was suffering from the DT's or alcohol withdrawal.  Aside from sending an e-mail to the Jail and nursing staff, Chapman failed to act after noting that Speers was going through the DT's.  If Chapman had the state of mind to note and/or observe that Speers was suffering from the DT's, a condition which is not (according to Sheriff Bailey and the Jail Procedure Manual) treated at the Jail, Chapman could have, at a minimum, attempted to comply with J-52 by notifying the medical staff, or by referring Speers to the hospital.  While Chapman's conduct does not necessarily establish that he acted with deliberate indifference, the evidence does present a sufficient question on the issue of whether Chapman's response to Speers' condition was reasonable and whether he disregarded a substantial risk of serious harm to Speers' health.  Therefore, Chapman is not entitled to judgment as a matter of law on Count I and the Court will deny defendant Chapman's motion for summary judgment on Count I.

### b. Deputy Donald Mangold

It is undisputed that Mangold worked from seven a.m. until three p.m. on Thursday August 22, 2002 and that Mangold moved Speers from OR-03 to OR-05 during the morning of August 22, after Mangold was told that other inmates in OR-03 wanted the "crazy guy" moved.  Plaintiff argues that Mangold knew how sick Speers was because he had direct observation of him for eight hours on the day of Speers' death.  Plaintiff also argues that Mangold contacted Nurse Mark Haueisen, that Haueisen "did nothing," and that this establishes that Mangold was deliberately indifferent to Speers' serious medical needs.

Mangold must have drawn the inference that a substantial risk of serious harm existed if he did not act before a jury could consider whether Mangold's failure to act amounted to deliberate indifference.  *See Miller*, 408 F.3d 803.  When viewing the evidence in a light most favorable to plaintiff, Mangold knew about Speers' deteriorating condition, and even noted on plaintiff's medical check card that plaintiff was going through DT's.  (Mangold Dep., Ex. N, p. 50, Indiv. Def.'s Mot. for Summ. J.)  Mangold also spoke to Nurse Haueisen about Speers going through the DT's, after Mangold moved Speers to OR-05, and Nurse Haueisen did nothing.  Speers' condition was deteriorating on August 22.  Mangold had the presence of mind to note that Speers was suffering from the DT's and to move Speers to his own observation cell.  Plaintiff has produced sufficient evidence for a reasonable jury to find that Speers was suffering from a serious medical need, Mangold knew about that need, and disregarded the substantial risk of serious harm to Speers' health.  *See Carter*, 408 F.3d at 313.  Accordingly, the Court will deny Mangold's motion for summary judgment on Count I.

### c. Deputy Mark Haueisen, R.N.

Nurse Haueisen was present at Speers' initial medical evaluation on August 21 and knew that Speers had a history of alcohol withdrawal problems in the past.  Nurse Haueisen was informed by Deputy Mangold that Speers' condition was declining on August 22, yet Haueisen did not notify Dr. Gray, perform any further physical examination of Speers or contact the hopital.  Haueisen also saw Speers hallucinating, a behavior that is consistent with alcohol withdrawals/DT's, yet Haueisen did nothing.  Furthermore, Haueisen was present at the meeting with Dr. Gray on August 21, and therefore knew that Speers was going through withdrawals and at risk of going into the DT's. Viewing the aforementioned facts in a light most favorable to the plaintiff, the Court finds that there

is a question of fact on the issue of whether Nurse Haueisen was deliberately indifferent to Speers' serious medical needs. A reasonable jury could find that Haueisen acted with deliberate indifference, based on the fact that Haueisen was informed that Speers was going through the DT's, observed behavior consistent with the DT's, failed to take action when he saw that Speers was suffering from the DT's, and thereby disregarded the substantial risk of serious harm to Speers' health. *See Carter*, 408 F.3d at 313. Accordingly, the Court will deny Nurse Haueisen's motion for summary judgment on Count I.

### d. Deputy Pat Brown, R.N.

It is undisputed that Nurse Brown worked the afternoon/evening shift at the Jail on August 22. Mark Williams stated in an affidavit and in his deposition that he heard Speers pleading to Nurse Brown for help, stating "I need medication, this isn't working, I need the right kind of medication." Williams further stated that he watched Brown simply turn and walk away after hearing Speers yell for help. According to Williams, Brown always used a cart to dispense medication. Williams also stated that he did not believe Brown ever gave Speers the medication Dr. Gray presecribed, as Williams never heard or saw Brown' medication cart.

The Court finds that there are sufficient questions of fact regarding defendant Brown's conduct that summary judgment is not appropriate. Viewing the facts in a light most favorable to plaintiff, a reasonable jury could conclude that Nurse Brown was deliberately indifferent to Speers' serious medical needs, based on the evidence that tends to show Speers' condition was deteriorating throughout the day and evening of August 22 and that Nurse Brown knew Speers was suffering from the DT's. Furthermore, if believed, the testimony of Mark Williams could establish that Nurse Brown acted with deliberate indifference by ignoring Speers' pleas for help, and by failing to take

28

any action after being informed that Speers was going through the DT's. *See Carter*, 408 F.3d at 313. The aforementioned evidence could lead a reasonable jury to conclude that Brown disregarded a substantial risk that Speers could suffer substantial harm. Accordingly, the Court will deny defendant Brown's motion for summary judgment on Count I.

### e. Deputies Perry Bundy, Kevin Tierney, Barry Oliver and Eric Hyun

It is undisputed that Bundy, Tierney, Oliver and Hyun worked the 11:00 p.m. until 7:00 a.m. shift on August 22 and August 23. Hyun was the shift commander. Bundy, Tierney and Hyun checked on Speers on several occasions between 11:00 p.m. and 4:30 a.m., and marked the medical check card that had a notation that Speers was going through the DT's. Bundy admits that he observed Speers banging on his cell door. Tierney admits that he saw Speers, in the early morning hours of August 23, playing with the locks and sitting on the floor of his cell with his clothes off and in his lap. Oliver admits that he observed Speers reaching out the food slot of his cell door, playing with the lock and sitting on the floor, playing with his clothes. Oliver admits to checking on Speers between two and four a.m., the time at which the Jail trustees state that Speers was, according to them, in need of assistance. Both Bundy and Tierney stated that behavior they observed Speers exhibiting was not unusual at the Jail, and that they never believed Speers to be at risk of injury or death. Hyun also testified that he observed inmates going through DT's, or what he referred to as alcohol withdrawals in the past and that the fact that Speers was alleged to have been going through the DT's did not cause any alarms to go off in his head.

Plaintiff has produced evidence, in the form of deposition testimony and affidavits from Jail trustees and inmates who were incarcerated during Speers' incarceration. This evidence, if believed, tends to show that Speers was exhibiting increasingly bizarre behavior, including, but not limited

to, yelling, taking off his clothes, hitting his head against a plexiglass window and halucinating. Plaintiff has also produced evidence from several medical doctors which, when viewing this testimony in a light most favorable to plaintiff, tends to show that Speers was exhibiting symptoms of alcohol withdrawal and eventually DT's, which should have led to Speers' removal from the Jail to the hospital.  While the testimony of the inmates and plaintiff's experts may prove unpersuasive at trial, the testimony of the jail inmates, plaintiff's experts and the testimony of the individual defendants, as it relates to their observations of Speers, if believed, could lead a reasonable jury to conclude that deputies Bundy, Tierney and Hyun were deliberately indifferent to Speers' serious medical needs.  Accordingly, the Court will deny defendant Bundy, Tierney, Oliver and Hyun's motion for summary judgment on Count I.

### 2. Qualified Immunity

The individual defendants raised a defense of qualified immunity.  Qualified immunity shields from liability for civil damages those officials whose "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Scicluna v. Wells*, 345 F.3d 441, 444 (6th Cir. 2003) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)).  In analyzing qualified immunity claims, this Court employs a sequential analysis prescribed by the Supreme Court in *Saucier v. Katz*, 533 U.S. 194, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001).  First, plaintiff must show that defendants deprived Speers of a right protected by the Constitution.  *Thomas v. Cohen,* 304 F.3d 563, 569 (6th Cir. 2002). Second, this right must be so clearly established that a reasonable officer would understand that his or her actions would violate that right.  *Id.*  To determine whether or not a right was "clearly established" the court must do so "in light of the specific context of the case, not as a broad general

proposition." *Greene v. Barber*, 310 F.3d 889, 894 (6th Cir. 2002) (quoting *Saucier*, 533 U.S. at 201).

Given the analysis of defendants' conduct pertaining to plaintiff's § 1983 allegation, *supra* § C. 1, the Court finds that plaintiff has produced sufficient evidence, which tends to show that the individual defendants violated Speers' Eighth Amendment right to be free from cruel and unusual punishment by depriving Speers of medical assistance. *Comstock*, 273 F.3d at 702.

Once it is concluded that Plaintiff has alleged facts which, if true, would establish a violation of plaintiff's Eighth Amendment right, the Court must assess whether that right was clearly established in August 2002, such that a reasonable official would have understood that his conduct violated the right. *Barber*, 310 F.3d at 894 (citing *Saucier v. Katz*, 533 U.S. 194, 197, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); *Danese v. Asman*, 875 F.2d 1239, 1244 (6th Cir. 1989). This right was clearly established at the time of defendants' alleged violation. As early as 1972, Sixth Circuit stated that "where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, the denial of such aid constitutes the deprivation of constitutional due process." *Fitzke v. Shappell*, 468 F.2d 1072, 1076 (6th Cir.1972); *see Heflin v. Steward County*, 958, F.2d 709, 717 (6th Cir. 1992) (pretrial detainee's right to medical treatment for a serious medical need has been established since at least 1987). Therefore, because the Court finds that there is a sufficient question as to whether the individual defendants violated plaintiff's constitutional right to be free from cruel and unusual punishment and that right was clearly established at the time of defendants alleged violation. Defendants are not entitled to qualified immunity.

### 3. Count II – Gross Negligence

In Count II of plaintiff's amended complaint, plaintiff asserts state law claims against the

individual defendants, alleging the individual defendants were grossly negligent.  Such claims are designed to fall within an exception to the statutorily prescribed governmental immunity to which the individual defendants would otherwise be entitled.    Under M.C.L. § 691.1407(2)(c), a governmental employee is not immune from tort liability where the employees conduct amounts to gross negligence which is the proximate cause of the injury.  "Gross negligence" means "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results."  *Id.*

The definition of gross negligence under Michigan law establishes a standard materially indistinguishable, as applied to the facts of this case, from the deliberate indifference discussed above in connection with plaintiff's § 1983 claims.  *Soles v. Ingham County*, 316 F. Supp. 2d 536 (W.D. Mich. 2004) (citing *Farmer*, 511 U.S at 836-38, 114 S. Ct. 1970 (discussing relationship between recklessness and deliberate indifference).  For the reasons mentioned above, that plaintiff is found to have established a genuine issue fact as to whether the individual defendants acted with deliberate indifference to Speers' serious medical needs, the Court also finds that plaintiff has produced sufficient evidence for a reasonable jury to find that the individual defendants were grossly negligent or reckless in their treatment of Speers.  Accordingly, the Court will deny defendants' motion for summary judgment on Count II.

### 3. Count III – Unlawful Detention

Plaintiff alleges that at the time of Speers death, Speers was being illegally detained and that the individual defendants should be held liable for such unlawful detention.[9]  Plaintiff alleges that Chapman decided to not honor Judge Wiley's release order due to Speers' medical condition.

---

[9] Plaintiff does not bring a claim of unlawful detention against defendants Haueisen or Brown.

Plaintiff further argues that there are no written policies within the Policy and Procedure Manual related to the tether bond procedure.

Defendants claims they are entitled to summary judgment because the Sheriff's department has been given the authority to detain an inmate beyond his/her sentence for purposes of setting up an electronic tether monitor.  Defendants rely on an affidavit from Sheriff Bailey who swore in an affidavit that the Sheriff's department was given authority from "the Berrien County Trial Judges to use its discretion in the release of inmates or detainees who have been sentenced to electronic tether release. . ."  (Def. County's Reply Br. at 6.)

Sheriff Bailey's, affidavit, where he stated that the "Berrien County Trial Judges" have given his department unfettered authority to delay the release of inmates/detainees who have been sentenced to tether release does not establish that defendants are entitled to judgment as a matter of law.  Defendants do not state which judges gave the Sheriff this authority, when it was given, or point out in which document(s) this alleged authority is memorialized.  While the facts may ultimately disclose that the Sheriff's department and the individual deputies are able to delay an inmate's release, the record before this Court does not establish that defendants are entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Accordingly, the Court will deny defendants' motion for summary judgment on Count III.

### III. CONCLUSION

For all the foregoing reasons, the Court finds that there are genuine issues of material fact, which preclude summary judgment on all claims against the individual defendants, except Sheriff Bailey.  The Court also finds that there are genuine issues of material fact that preclude summary judgment in favor of the County on plaintiff's failure to train theory in Count I.  The Court also finds

that defendant County  is entitled to summary judgment on plaintiff's unconstitutional *de facto*

policy claim in Count I as well as Counts II and III.

 An Order consistent with this Opinion shall issue forthwith.


Dated: July 21 , 2005                           /s/ David W. McKeague
                                               DAVID W. McKEAGUE
                                               UNITED    STATES    CIRCUIT    JUDGE